The Honorable Judges of the United States Court of Appeals in and for the Seventh Judicial Circuit. Hear ye, hear ye, hear ye. All persons having business before this honorable court are admonished to draw near and give their attention as the court is now sitting. God save the United States and this remotely, there is some chance of delay and crosstalk. I may intervene if it looks like too many people are trying to talk at once, but generally this works well if we understand the limitations of the technology. So we're ready to proceed with the first argument this morning, which is Arbitrage Event-Driven Fund against Tribune Media. Mr. Entwistle. Good morning, Your Honor, and thank you very much for your time this morning, the three of you. I'd also like just to take a minute of my time. We've reserved five minutes, by the way, but I'd like to take a minute just to thank your staff. Frank and Matt, in particular, did a great job with the session remotely and getting us all on board this morning, and it's no small feat having been in probably 100 of these arguments since March. This has worked really seamlessly, and as an attorney, I have to say a special thanks to them. This is a very unique Tenby case. I know this is a very experienced panel. You've seen a lot of Tenby claims. It is rare that we have a case where all of the underlying conduct from the plaintiff's standpoint is admitted effectively by the Tribune defendants in this case through a verified pleading that was filed in the chance report. In that pleading, among other things, they acknowledged that virtually from the moment the merger agreement was signed, Sinclair, which was the counterparty to that transaction, repeatedly and willfully breached its contractual obligations in spectacular fashion. And the amended complaint here in this case is replete with its descriptions of each and all of those various actions. And in fact, as you have before you in the record, as part of the supplemental appendix put in by the appellees, a copy of the verified complaint that was filed in the chancery court, which goes on in excruciating detail to lay out exactly what happened during the course of this merger transaction ignored all of those facts. Instead, it assumed wrongly that the statements that were being made by the Tribune defendants were simply statements of past actions. In other words, statements historically of what was said in the merger agreement as opposed to current statements about what was happening in the course of the merger transaction. As a practical matter, the language that was quoted about Sinclair agreeing to take certain steps, agreeing to do divestitures, agreeing to do all of those things, was repeated on at least three occasions. First, in the connection with the November 29, 2017 prospectus and registration statement, again in the with the May 10, 2018 10Q. Now, what's telling about that is in each case, and especially in the first two cases, that was also coupled with a current statement that the merger was essentially proceeding on track. In the first case, in the prospectus, that in fact the merger was going to close in the first quarter. Now, keep in mind those statements were made at the end of 2017. What we know that Tribune knew at that time was that, besides the statement I mentioned a minute ago, that Sinclair had been essentially obstructing the entire regulatory process before the FCC and the DOJ. In fact, its initial submission to the FCC was made in June of 2017, and it didn't contain any of the normal divestiture and related submissions that are normally made in that regulatory context. Judge Scudder, if you don't mind, I'd like to ask you a question about what you're getting at just now, because I think, at least to my mind, and you can correct me if I'm mistaken, this gets to the heart of the issue for me on the 10B claim against Tribune. Where in your complaint do you allege that Tribune knew about the relationship entanglements that became the big problem with the FCC for Sinclair? And the reason I'm asking that is because I'm that those entanglements had become known to Tribune before the end of the FCC comment period, before the Chairman's announcement in July of 2018. Where you allege that with particularity in your complaint? And I can think of a couple of candidates that you might point to, but I'm interested, you know, paragraphs in the amended complaint, but I'm interested if you can point us specifically to where that allegation is. And so as a practical matter, Your Honor, we see those various provisions in, for 43, 44, and 45 of the amended complaint. Okay, that's what I thought you might point to. Okay, the problem or the challenge that I think you have, and you're welcome to persuade me otherwise, is that I don't think you're specific enough as to time. Okay, the when part of it. So take 134. Tribune warned Sinclair that proposing these related party sales was incompatible with using best efforts to obtain prompt regulatory approval. You know, etc, etc. As Tribune expected 135, the FCC staff expressed frustration. Okay, when exactly Tribune knew that, in my mind, is important on the sufficiency of the And so there's no indication of when Tribune came into that knowledge. Is it before or after that March 1, 2018 10-K? And the reason that I'm asking that question, and I'm pressing you for some detail, is if I understand the timeline correctly, Sinclair is amending its FCC, I don't you know, along the way. In other words, time is not static here. The events are not static. Time's moving. And so can you can you help me with where you allege with particularity when Tribune acquired this knowledge vis-a-vis the FCC in particular? And so the answer, Your Honor, is is that it's a there's a sort of a as we go through that process and and really, as a practical matter, um, you know, those are the principal paragraphs. You're absolutely right that there's a timeline that runs through this. And, um, as we as we look at this, um, you know, where we have both our complaint and, of course, we've got the references in our complaint to the complaint that Tribune filed in Chancery. And we know, for example, in connection with what was filed in in Chancery that the that these misrepresentations to the FCC, um, are sort of all manifest, um, as as early as, um, you know, all through all through that early part of February. We also know that, um, in January of that year, um, Tribune Sinclair rather had told the FCC that it wasn't yet ready to begin, um, talking to them about divestitures. And so the FCC paused the process. Then following that, in the beginning of February of that year, we have a, um, a series of of issues where they come to the, um, back to the FCC in in that process. And the FCC tells, um and and we we know in February of 20 that Sinclair misrepresented to the FCC that the D O. J. Said it would keep allow it to keep ST Louis, even though on that same day, um, the F the F. The, um, D O. J. Had, in fact, rejected, um, the Valentine's Day proposals that have been made in that regard, and that these negotiations were all ongoing. But isn't but Sinclair vis a vis the FCC is not so much the question. I think what you're saying is it may be fair that there's a lot going on. There's a February 20th submission. There's a February 27th submission. All that in my mind. And again, I invite you to persuade me that I'm mistaken. Um, what? What matters is what Tribune knew about that. I agree with you, Your Honor. And, you know, what we do know is is that throughout this entire process, Tribune was participating in the entire process along with, um, along with Sinclair, including before the FCC. And that Tribune had, in fact, warned Sinclair on numerous occasions in that same time period that pre March time period that these, um, what the this, um, contingent divestiture trust that it was proposing wouldn't fly. It was completely unorthodox. It had also made clear to them that these transactions that it was proposing with joint, uh, sales agreements and related complications were all a part of the same problem and were, in effect, going to be viewed as sham transactions. And then, of course, the FCC responded in kind again during that same period before March. And then that takes on a whole new life between March and the May 10 disclosure in the 10 Q, where the FCC rejects a whole series of proposals that were that were made both in terms of the contingent divestiture trust and in connection with these sham transactions. Now it is. In fact, it does. If you only look at the, um, at the chancery court complaint, there is a statement in there by Tribune that says that at some point in time, it was surprised by the fact that Sinclair had made certain misrepresentations. Now, while those misrepresentations caused certainly the reference to the administrative judge, none of that changed the fact that Tribune had warned, um, Sinclair throughout the process that the contingent divestiture trust proposals to avoid the duopoly requirements by the FCC were absolutely a structure that wouldn't fly. And, of course, the FCC told them the same thing and that the related party sales, which were part of the same process, would also not fly and that the FCC and, of course, the D O J as well wouldn't accept these joint sales and related agreements. And so all of that is is knowledge. The complaint has a number of paragraphs that talk about the fact that Tribune participated in all of these proceedings before both the FCC and the D O J. And the point is, is that I think we we've really pled this sort of dual history as we go through the process. And it's very clear that in connection with this process that Tribune had an obligation to speak and to speak truthfully about this spectacular violation by, um, Sinclair on an ongoing basis, both before the D O J and the FCC. And there is no question that when we finally get have the truth begin to emerge in July, when Chairman Pi finally speaks about these issues as as they relate to the FCC that we also have had, you know, the same conduct that has happened throughout with regard to the D O J going all the way back to the beginning of the process and certainly preceding the November 29 prospectus. And and that conduct is detailed, keeping in mind that not only did they know that that Tribune was not going forward with rather Sinclair wasn't going forward before the SEC during that period to provide any of the usual regulatory pieces. They also, of course, had all the issues with the D O J that are detailed in the complaint than in weren't the D O J issues, though, effectively were from Tribune's perspective. Um, or I guess I guess the better way to put it is where do you plead to the contrary that Sinclair and the and the Justice Department have reached an agreement in principle by approximately mid February of 18? Right now, there's no question there was a lot of back and forth and Tribune registered its agreement in those letters that you point to. I don't there's no doubt you're right about that. But with respect to the Justice Department, it sure seems to me from reading the pleading that the fairest inference is that this was wrapped up by the middle of February. And then they had to turn an FFC. So that's absolutely not not not the case. In in this sense, that that conclusion, which is an argument that was picked up on by the district court, actually came out of, um uh, you know, information that was in the chancery court complaint that was put into the mix by the defendants, which is fine. But we know from paragraph 92 of that chancery court complaint specifically that the that the Scott, first of all, that the discussions did not in February did not end the inquiry at all that the Justice Department was continuing and in fact rejected. If you read that that paragraph carefully, it actually rejected that proposal. And there were ongoing discussions that were, in fact, never resolved. Even in April, when there was a term sheet agreed to, uh, tentatively with the, um, with Sinclair and the Justice Department, they continue to negotiate divestitures. And in particular, the ST Louis divestiture was ultimately rejected, and no agreement was ever reached. But certainly by March, all that you had was a proposal that was, in fact, rejected. Um, and Sinclair and Tribune itself acknowledges at 92 that the discussions were ongoing. It didn't end, as they say, um, the process, and it didn't end the disputation, as they call it in in that paragraph. And so the district court was simply wrong when it reached that conclusion. I'd also note the paragraph 92. Yes, sir. You are well into your rebuttal time. I recognize that, Your Honor, and I appreciate it. Um, and so I just make this final point that paragraph 92 of the chancery court complaint also makes it clear. Um, one, um, that's the day that they misrep make further misrepresentations to the FCC. But it does note that they did that, even though the Justice Department had had said that day that it had not agreed to church in ST Louis to be a non before station. So even as of, um, of February the 20th, which is after that 14th date, you don't have an agreement across the board. So, um, with that, I would just leave my remaining points for the two minutes or so that I have. Um, unless one of your honors has a further question. Thank you, Mr Rent. Whistle. Thank you, Mr Greenfield. Yes. Good morning. And thank you, Your Honors. Elliott Greenfield of Dubois and Plimpton for the Tribune and director defendants. Um, I want to get to some of the points that Judge Scudder and Mr Ant whistle were discussing. I just like to note at the forefront, though, that the district court dismissed the complaint on multiple independent grounds. Obviously, affirming on any one of those grounds is sufficient. Um, the discussion of Sinclair's conduct and when agreements were reached or not reaches really most relevant to the center allegation. But there's no, um, pleading of a misstatement or omission that's actionable in this case, and there's no loss causation this case either. Um, but I'd like to unless anyone has other questions, I'd like to just respond to Judge Scudder's concern, which I think is a valid one of where is it in this complaint where plaintiffs allege that Tribune knew of the entanglements between, um, Sinclair and its proposed divestiture partners. It's those undisclosed entanglements that caused concern with the D O. J. That Sinclair, even as he was proposing these sales, would continue to control the stations it was supposedly selling. Uh, and the Delaware complaint on which plaintiffs acknowledge their their complaint is entirely based on makes clear that those entanglements did not come to light until the public comment period. The public comment period was May 21st to July 12th. So that's after all of the alleged statements in this case were made. Um, if you look at, for example, paragraph 108 of the Delaware complaint, which is supplemental appendix page 49, uh, it talks about the proposed divestitures. At the end, it says as soon became clear, however, Sinclair's close association with Cunningham raised the prospect that it would nonetheless be able to control in those those two stations. Um, it goes on to 10. Um, that facts came to light during the public comment period. Paragraph 109 talks about the public comment period beginning. Paragraph 1 10 says that it came to light during the public comments period that Sinclair had failed to disclose in its application to the commission certain material facts, including the full extent of Smith. That's David Smith, the chairman of Sinclair relationship with Stephen Fader, who proposed to WGN to, uh, and relationship between Sinclair and Cunningham on between Cunningham and the Smith family. Um, the, uh, FCC's H. D. O. It's it's hearing designation order where it it sent the matter to an administrative law judge details this. Um, it's also, you know, there are excerpts of that that the full, uh, H. D. O. Is in the supplemental appendix as well. That's supplemental appendix 2 22 to 2 43. There's excerpts from it in the Delaware complaint. Um, it's it's, uh, for example, field. Um, let me let me just follow up on on your points there. So how do you respond to Mr Entwistle that the questions I was asking, for example, about paragraphs 1 34 1 35 45 etcetera. What? What? In substance, I heard him to be saying is, you know, don't don't read him in such such an exacting nature because, um, it is pretty plain from the overall complaint that it is alleged that Tribune was well aware that FCC approval was necessary for this merger to close, and Tribune was well aware, um, of, you know, quite a bit of the back and forth that was going on between Sinclair and the FCC. And that's enough. Right. Well, I think I think the problem there is, um, you know, that, you know, being being aware of what's in the FCC applications is not the same as being aware of these undisclosed facts. It's definitely stated in the Delaware complaint that those facts were not disclosed in the FCC applications. That was that was the whole problem. Um, one thing that Mr Entwistle is doing is he's conflating a whole different set of issues with the FCC applications that are completely separate. So there's, for example, the divestiture, the contingent divestiture trust. This is the idea that Sinclair rather than specifying which stations it's going to sell, it's going to put something like 50 or more stations into a trust. It's going to try to find the best price for different stations, and it'll decide later which one it's going to sell, and then it will take back the rest. That Tribune Warren was objectionable. It also proposed, uh, sales to related parties, along with, um, you know, separate side agreements whereby Sinclair would continue to provide programming and advertisement and other services to the station. Tribune also warned Sinclair against doing that, not because there's necessarily anything wrong with it. Sinclair had sold plenty of stations to Cunningham in the past, but because it invites extra scrutiny from the FCC. Um, they need to look closely at what are those agreements and ensure that the proposed divestiture partner is actually going to control the station after the sale. Um, so it warned him against doing that. It said, Why don't you propose clean divestiture to third parties? Sinclair refused to do that. They went ahead with their related party sales, but there's nothing suggesting anywhere in the amended complaint or certainly in the Delaware complaint that Tribune was aware of these undisclosed facts. So, for example, um, Tribune, uh, Sinclair proposed to sell WGN to Stephen Fader. Stephen Fader was a friend of David Smith, the chairman, executive chairman of Sinclair at the time. Um, so, you know, and that Tribune, you know, warned against that. It's going to invite scrutiny. We're trying to, you know, you agree to do everything to get this, uh, um, merger closed as practicable. Um, but, uh, what, what came to light during the public comment period, and that's, again, it's clear in the Delaware complaint and in the, uh, the HDL, um, is that, uh, David Smith owned a controlling interest in the company where date, where Stephen Fader was the CEO. So that, that suggests a level of control over Stephen Fader that gave the FCC concern, that, um, gave rise to concern the FCC, that Sinclair was going to continue to control WGN even after his, uh, proposing to sell it. It's not just the fact that it was a related party transaction. And the same with Cunningham, it had sold, uh, sold, um, stations to Cunningham in the past. The difference was that, um, earlier in 2018, the voting shares of Cunningham had been sold at a below market price to a longtime friend of, uh, the Smith family and, and a, uh, an associate of Sinclair. Uh, and, uh, and, and as part of that sale, David Smith and his brothers, uh, had a, had a right to repurchase all of those voting shares at a, at a low price. So, you know, and Sinclair had guaranteed debt for, uh, Cunningham. There were a number of other entanglements. All of that came to light during the, uh, public comment period. Um, there's, and there's no allegation anywhere otherwise. Um, so I'm not sure if, uh, what about Mr. Antwistle's point that the, the DOJ, um, issues remained and spilled over into the FCC period. In other words, it's not proper to read the complaint as, you know, there, there had been effectively a bookmark put on the DOJ issues. They were just waiting for the FCC matters to wrap up. Thank you. Yeah, I did want to address that as well. I appreciate that. Um, so what's going on is there is a, from mid-December through mid-February, there's a back and forth between Sinclair and the, uh, the DOJ. There's also letters back and forth between Tribune and Sinclair where Tribune is to vest at your demands. Uh, if you look at the Delaware complaint, uh, it lays out this timeline on February 9th. So we're approaching the, uh, the February 14th mark. Um, just finding this page. Uh, so we're getting close and this is paragraphs, uh, 85 through 91, really where this is described in the Delaware complaint, supplemental appendix 38 to 40. Um, DOJ had been demanding, uh, divestitures in all 10 market areas, uh, at the last minute said, okay, we'll leave open, um, Greensboro. Um, this is paragraph 89. Uh, DOJ was open to letting Sinclair keep all the stations in Greensboro. And again, tentatively allowing Sinclair to divest the CW station in St. Louis rather than a big four station, uh, on paragraph 91. Um, you know, they're threatened with a lawsuit, you know, the next day, if they don't agree to this and, uh, and they, they call the, uh, the DOJ and they agree to that, uh, the DOJ subsequently decides, you know what, uh, this is paragraph 92. Um, we actually do want you to sell a station in Greensboro and we're not satisfied with the CW in St. Louis. So there's some continued, you know, discussion about those two market areas. And, but, you know, I think it's very clear from the Delaware complaint that they had an agreement of principle at that point, they were going to think Tribune was going to file a lawsuit. It didn't file it. Uh, they, you know, there was some discussion with those two market areas. Um, and Sinclair went ahead and filed its, uh, SEC, uh, FCC applications the next week. And I've been waiting for resolution with the DOJ before filing this. Um, since I have a little time left, uh, I guess let me, uh, address loss causation as well, because that's something that has not been raised yet, but I think, uh, you know, it's pretty clear that there's a big problem with loss causation. The, um, there, there's, there needs to be to plead loss causation, a direct causal connection between the misrepresentations and the alleged economic loss here. There's a, that, that connection is clearly missing. Um, the alleged misrepresentations relate to a failure to disclose Sinclair's conduct with the DOJ. Um, and the alleged corrective disclosure is FCC chairman, uh, uh, July 16 statement, uh, where he and these facts that had come to light during the public comment period. So, you know, with respect in particular to the, uh, November, uh, offering materials, which are, um, the sole basis of the securities act claims, it's, it's impossible that there could have been lost causation because the, uh, you know, the alleged corrective information didn't even, uh, exist at that point. The FCC applications weren't filed until months later. Um, and with respect to the March and May statements, as we've just been talking about, there's no allegation anywhere that tribune knew the undisclosed facts about Sinclair's entanglements. Um, at the time I had made those statements. Time is up. Thank you, Mr. Greenfield. Thank you, Mr. Ehrlich. Uh, thank you judge Easterbrook and may it please the court, Andrew Ehrlich of the Paul Weiss firm on behalf of the Oaktree appellees. Uh, your honors, the district court correctly held that plaintiffs failed to state a claim under section 20a of the securities exchange act of 1934. And this court should affirm that hold Oaktree was a minority shareholder of tribune at the start of the alleged class period. In this case, owning approximately 16% of the common stock between November 29th and December 4th of 2017, Oaktree sold approximately half of its holdings of tribune stock in the secondary offering at issue in the claim. Plaintiffs asserted a section 20 big a claim under the exchange act was, which is the court knows in essence is a private right of action to recover for insider trading. But as the district court correctly held plaintiffs failed to plead such a claim and it's so held on four grounds, any one of which would justify affirmance here. First and foremost, the district court correctly held that plaintiffs failed to plead that Oaktree was in possession of material non public information. And the consolidated amended complaint I would submit is a classic must have known pleading on on that score. There are no specific facts whatsoever going to the who, where, what, when of Oaktree's supposed knowledge. Indeed, they're pleading on Oaktree's knowledge of the alleged material non public information is done on information and belief. That's paragraph 161 of the complaint, which is fundamentally inconsistent with indeed antithetical to the specificity that is demanded by the private securities litigation reform act of 1995 and federal rule of civil procedure 9b. And under this court's precedents, most notably, Judge Easterbrook's opinion in the Higginbotham case, these kind of must have known allegations totally unburdened by any specific facts were properly dismissed and that should be affirmed. The closest that the plaintiffs come the appellants here to Oaktree had material non-public information is that an Oaktree executive, Bruce Karsh, previously served on the Tribune board. But Mr. Karsh left the board on October 27 in October 2017, about a month before the secondary offering. And more important, regardless of the timing of his departure from the board, plaintiffs plead no specifics as to Mr. Karsh's knowledge at any particular time. They simply plead that as a director, Mr. Karsh had access to facts that they contend constitute material non-public information, but as well established under 10b5 case law, that access to information cannot be equated to knowledge of information without specific allegations establishing knowledge. Indeed, the district court concluded correctly that the supposed material non-public information did not even exist at the time of the Oaktree offering. According to plaintiffs own allegations and the Delaware complaint upon which they rely, the regulatory process with DOJ for the Sinclair approval did not begin in earnest until October of 2017 and all that had happened by November 29 when that offering was made, taking the is one, that on November 17, DOJ advised Sinclair that it was unpersuaded by Sinclair's arguments to date and that its concerns could be resolved by divesting some number of stat stations, and two, that on November 20, DOJ rejected a Sinclair request to pause investigatory depositions without putting divestitures on the table. That's paragraph 64 and 65 of the Chancery complaint found at Supplemental Appendix page 27. As the district court observed in its opinion, the complaint itself does not allege that Sinclair ever first refused DOJ's position on divestitures until December 15 after the Oaktree offering was completed and the rubber didn't really hit the road as the questioning and colloquy with Mr. Entwistle and Mr. Greenfield makes clear until long after the Oaktree offering was completed. Any fair reading of the factual allegations of the complaint is that the alleged obstructionist bullying confrontational conduct did not occur until 2018. As such, Your Honor, setting aside that the complaint does not plead facts establishing Oaktree had non-public information about the status of the merger, the complaint, the was not material non-public information as a matter of law. Second, Your Honors, the complaint does not plead that Oaktree owed a duty to tribute, a necessary element of any insider trading claim. There are of course multiple theories of insider, of duty rather, that a plaintiff may pursue in a insider trading case here. The plaintiff elected to pursue the so-called classical theory of insider trading which applies to corporate insiders but such a claim can arise only where the trader has breached a duty of trust or confidence to an issuer or its shareholders and the problem for plaintiffs is that on the facts alleged in this complaint, Oaktree is not an insider under any possible definition of the term. It was a 16% shareholder at the time of the sale. It no longer had a board representative, not that having a single board representative alone an insider makes. Plaintiffs cite no authority anywhere for the proposition that a party situated like Oaktree in this case constitutes a corporate insider such that a claim may be asserted under the classical theory of insider trading. Third and and finally, Your Honor, the complaint fails to plead a strong inference of scienter. As an initial matter, given the total absence of any specific facts, alleging Oaktree was aware of supposed material non-public information when it traded, the district court again following the reasoning of Higginbotham held the complaint fails to plead scienter. On the remaining issues, Your Honors, we will rest on our briefs unless the court has any questions. Thank you, Mr. Ehrlich. Anything further, Mr. Entwistle? Yes, Your Honor. Not surprisingly, I'm going to use that last two minutes, if I may. First, let me briefly respond to Mr. Ehrlich. As a practical matter, and this court I think knows the law well, so I won't belabor the point, there is no requirement under Section 20, Big A, that you be an insider. There's no breach of fiduciary duty standard. There is no on the basis of or use requirement under 20, Cap A. All that's required is that you possess material non-public information, and that's clearly pled in the complaint, and that's all that is required. The district court imposed any number of new standards that were advocated by the defendants. It simply adopted those standards, none of which are in the statute or in the law. Let me turn back to Judge Scudder's questions earlier and just make one or two quick points. Number one, at paragraph 132, Your Honor, at the last sentence in the paragraph, we plead that the Tribune defendants were aware that Sinclair was making the proposal, and then of course at 134, which we had been discussing, that the Tribune defendants were fully aware that these aggressive proposals would slow or altogether stop the process and review, and it's critical that we note that the Tribune was warning Sinclair about using the related party sales, and the Chancery complaint at 104, 105, and 106 in particular describe this in more detail, but I note that 106 indicates that Sinclair's proposal was so provocative that the FCC staff refused to even put it out to public comment when it had sales to Cunningham and Fader, and clearly Tribune was well aware of these facts, including that Fader himself was, had no experience whatsoever in the marketplace, and that there were these joint entanglements. Your Honor, thank you very much for your time. It's very much appreciated on all counts. The case will be taken under advisement.